Good morning, your honors. My name is Craig Gardner. I'm from the Federal Defenders of Eastern Washington, Idaho, here on behalf of Mr. Quintana. I think the basic issue in this case is it's a fairly simple fact pattern. Figuring out exactly how to apply the law of reasonable suspicion to this fact pattern is what the puzzle in this case is. The timeline is fairly simple. Officers Durbin and OHA were in a hotel parking lot early in the morning. They saw Officer Durbin notice a truck that he thought that he had recognized. He immediately told Officer OHA that the registered owner of that truck had warrants. He sent Officer OHA to detain that person. Sometime after that, Officer Durbin for the first time confirmed that the person that he believed was the registered owner of the truck was in fact the registered owner of the truck. There were two registered owners of the truck. About three minutes after that, at 446, the registered owner of the truck was confirmed at 443. The name of Mr. Quintana was run for warrants and checks at 446. Officer Durbin did not confirm that the person that he believed was the registered owner of the truck, which had by that point been confirmed, he did not confirm that warrants existed until 448. There are really two questions, two factual questions that the officers need to answer to make a determination about whether or not this stop was justified. The first is, is the person that we're stopping, is that the person we think he is? The second is, is there lawful reason, lawful authority to stop that person? As far as the first question goes, the government provides their argument is that that's supported by the fact that Mr. Yepes was the registered owner of the truck and that he matched the description of Mr. Quintana, who was eventually stopped. The registered owner, Officer Durbin, consistently referred to the fact that there were two registered owners. As far as the description, Officer Durbin initially testified to a physical description, height, weight, some other characteristics. On cross-examination, Officer Durbin conceded that what he had actually been using was a mental picture or a mental note that he had created concerning a very general description that the person was about his height or about his weight. He also conceded on cross-examination that he was unable to tell the height of the person who was driving the truck that evening because the person was sitting down in the cab of the truck. In the record at 42, Officer Durbin specifically states that he used the physical description as the reason for the contact. The second issue were the warrants. Officer Durbin described in detail some of the past contact that he remembered having, running the truck, and one of the registered owners, and determining that that person had current warrants. He didn't give any timeframe regarding any of the checks that he had done prior to March the 19th, or March the 16th, which was three days before the stop. On the 19th, Officer Durbin testified that he had remembered that the warrants were outstanding from his contact on the 16th. The record is not exactly perfectly clear, but I think the record does reflect that the access that Officer Durbin had to the warrants on the 16th was through three of 11 hits on a readout. There was a lot of information there. Officer Durbin had testified that he runs hundreds of cars and vehicles and individuals for warrants and license checks. Oh, he wasn't wrong, was he? I mean, in fact, there was an outstanding warrant on UPS. That's correct. And his recollection was three days old at the time of these events. That's correct. To be honest, I'm having trouble figuring out what exactly was wrong with the stop. You make a stop and realize the situation is unfolding, and so it's not like you've got all the time in the world before the person who winds up being your client pleads because he's not hanging around waiting for the police to check out whether or not they should pick him up. He has his own reasons to be concerned, as it turns out. So they stop. They recognize a truck. It turns out there are two registered owners. The person who's driving the truck at least isn't visibly unlike the person that Durbin has reason to be suspicious about. Even if it's a 50-50 chance, that would seem to be enough for reasonable suspicion. It would require probable cause for a stop. So what's the problem? Except that it's not 50-50 at that point. Even if those were the only factors involved, the fact that there were two registered owners, there are two separate questions that need to be answered. The first is, is this person the person that we think he is? And the second question, I think which really implicates the constitutional issues more closely, is is there lawful authority to stop? But didn't they have the right to stop him and just ask his name to find out if he was the person they thought he was? Officer Oha clearly reflects, and the government conceded in their brief at the government's response at 15, that Mr. Quintana was seized by Officer Oha when Officer Oha ordered him to come back towards him. So in theory, they could have stopped him if it would have been a consensual contact, but I don't think that's what happened here. A seizure occurred, a clear seizure as the government's conceded. Well, as I understand it, we've got several cases we're kind of looking at here. The can't get any past that. They may demand the suspect's ID as long as the request is reasonably related to the detention. They may detain the person in order to solve questions about his identity. And where law enforcement officers have been able to locate a person suspected of involvement of a past crime, the ability to briefly stop that person, ask questions or check ID, and even in the absence of probable cause, promotes the strong government interest. Now, here we have a situation where Quintana met the general description. I'm not going to say he was exact, but he didn't come, he wasn't against the general description. He was driving the vehicle. One of the registered owners, same one who was generally description, was subject to an outstanding arrest warrant. And in fact, the information on the other owner, he had some warrants. They saw this truck. The truck was the same as they'd seen on others. It was driven in an unusual manner. It passed several empty parking lots to go get somewhat different full spot, blocking all other vehicles. And he walks quickly away from the truck. And they weren't sure they would stop him if he could have been stopped walking quickly away from the truck. Now you tell me, that seems to me to meet the standard. I just want to go, I want to quickly go over a couple of things that are addressed by that. First is what Officer Durbin's exact statements were concerning his knowledge of the warrants existing. His statement on direct examination was that he felt very certain that on cross examination, when he was confronted with the language he'd used that night, he said, I think that Mr. Yepes has warrants. And he paraphrased that and it was pointed out that he eventually said that on the tape, that I'm pretty sure. In order to meet the reasonable suspicion standard, there have to be specific objective facts. And the warrant, the warrant has to be supported by specific objective facts. Officer Durbin's feelings and Officer Durbin's opinions that there are warrants isn't sufficient. That's not an opinion. He's reflecting the fact that he knew from three days before. And he's expressing it in a way that, as human beings do, reflects something less than absolute certainty. But you don't have an opinion whether or not somebody has a warrant, either they do or they don't. And he reflected that he did from three days before. And taking that as, you know, I think that that's open to debate or I think that that's unclear. Do you want to get to your second issue at all? I do. I do want to get to the issue at play. Because it's an important question whether we have enough information in the record to decide it or whether we need to wait for Arizona to begin. On the Thornton issue or the search incident? I would reserve that issue. I think that this Court can't make a decision until the Supreme Court's made its decision. Why? I think that this Court's squarely prevented by prior Ninth Circuit precedent, and I'll see if that Belton and Thornton apply. What about the presence of a passenger in this case? You know, it's really unclear from the record exactly where the passenger was when the search occurred. I think that if that was the ultimate issue in this case, that it would have to possibly be remanded for additional fact-finding on that issue. I would like to briefly address the issue from Grigg, which is in Grigg they had identified the person. They had a witness that said he had committed this criminal act. And the fact that the officers that, you know, the Court had was required to engage in a balancing test about the seriousness of the conduct of the completed misdemeanor had to weigh against the invasion of the privacy rights of the person that was stopped. Here, even conceding that, for argument, that Officer Durbin knew that the warrants existed, Officer Durbin had absolutely no idea, and there's nothing in the record to reflect that he knew what those warrants were. Under the Grigg test, and I agree with the government that that is the test that should apply, the Court should have been required to go through that analysis, and the government should have borne the burden of showing that the criminal activity for the completed misdemeanor was serious enough that it justified the intrusion. In Grigg there was no question that the person had been identified, the witness identified them, and that he had committed the act. The witness had provided direct testimony of the person that had committed the act. I see that my time is up, and I would submit this report. Thank you. May it please the Court, Tom Hanlon, appearing for the United States. There doesn't seem to be much of a dispute in terms of how the law applies to this case. The question is, regarding reasonable suspicion, is whether or not the officers had specific and articulable facts to justify the intrusion. I believe that both parties agree that that is the standard that applies. The question is, how do the facts in this case apply to that standard? I point out, looking at the facts of the case, prior to March 16th, on at least three occasions, Officer Durbin had been to the All-Star Motel. Officer Durbin has been with the Yakima Police Department for three years. He's very familiar with this area. How big is the town we're talking about, or this area? It seems like it's very small, just noticing the truck and who's driving it. The All-Star Motel is a normal, standard parking lot of a motel. It's not particularly a large area, but there certainly would be more than 20 vehicles in this area. Officer Durbin testified at the suppression hearing that he routinely goes to this area because it's a high-crime area. He routinely finds individuals who have felony warrants for their arrests. In addition, he often finds stolen vehicles. So when he has downtime, when he's not responding to crime, he runs license plates to determine if cars are stolen. Prior to March 16th, on at least three occasions that he can recall, he saw a silver Toyota pickup truck. He ran the license plate on that truck, and he determined the registered owner was Jose Ypez, with a date of birth of August 12, 1987. After running a check on the driver's license, he then ran the name and the date of birth for a warrant check. He determined that the same individual, Jose Ypez, with the same date of birth, with a description of being approximately 5'8 and 190 pounds, had two outstanding warrants. He also did a check on the driver check and on the license plate check to determine where the address came back to. He determined that the address came back to the same place, so this was, in fact, the same person. Fast forward to March 16th. He's assisting another local law enforcement agency who's identifying an unknown suspect. He uses the Spillman system, which is a computer system he has specialized knowledge using, because he used to be employed by a different law enforcement agency. On the Spillman system, which is at the actual police department headquarters, he can run pictures and identify individuals. He helped him identify this individual, then ran a warrant check. When he runs a warrant check, Officer Durbin testified similar names also pop up on the screen. In this particular case, when he was running that other individual, the name Jose Ypez popped up with a date of birth of August 12th, 1987. Once again, Officer Durbin was able to confirm this is the same person that on three prior occasions he ran to determine that he had outstanding warrants. In less than three days, on March 19th, Officer Durbin was back at the All-Star Motel arresting another fugitive that he found walking around the parking lot of the hotel when he observed this pickup truck pulling into the lot. Officer Oya had responded as a backup officer in regards to the person he was taking into custody. Officer Durbin recognized that that's the same truck that he's run on numerous occasions in which the registered owner had a warrant. He relayed that information to Officer Oya. The officers both got in their separate cars, and they began to follow this car. They noticed very unusual behavior. They observed that the defendant passed all the empty parking spots. He then stopped his car, which blocked in two to three other vehicles, and this was occurring at approximately 4.40 in the morning. He then saw the driver of the vehicle get out of the vehicle. Prior to him getting out, Officer Durbin was typing on the computer trying to determine if this vehicle was still registered to Mr. Ypez. Defense counsel stated the check was at 4.43. 4.43 was the first check, but he may have stayed typing as he was driving. It was a few seconds later at 4.44 is when he determined that the vehicle was still registered to Mr. Ypez. He determined that the vehicle was, in fact, still registered to Mr. Ypez. He saw Officer Oya go to contact Mr. Quintana, who was the driver. Officer Durbin was out of his car, and he saw that this individual matched the description of the person that he'd previously ran for warrants. The government's position is that based upon the facts of this case, that the officer clearly had reasonable suspicion grounded in specific facts, that is, the personal knowledge that Officer Durbin knew about these warrants and the registered driver to make a stop to ask him about his identity. Looking at this court's decision in the United States v. Crapser, in that case, police officers stopped the car. They saw a pressure cooker that the officer believed was used to manufacture methamphetamine. They asked the driver about it. He indicated that the pressure cooker belonged to a man named Gunnar Crasper. Officers ran that name. They determined that there was a warrant. It didn't say whether it was a misdemeanor warrant or a felony warrant, but there was an arrest warrant for that person. There was also a note on the computer screen that said, you're looking for Mr. Stovall, who uses the name Gunnar Crasper. It's not good for anybody else named Gunnar Crasper, just this individual Stovall. This court determined that when the officer went to the hotel to talk with Mr. Crasper, that it was reasonable for him to ask him about his identity and check to determine if he was the person that had a warrant for his arrest. The same in the United States v. Christian. Let's focus on the facts here for a second. So they stopped the driver, who might be Yepez, but turns out not to be. He asked for his identification or asked for his name. Does he give the right name? Does he say then he's Quintana? Yes. So he gives the name Quintana. Now, is there suspicion at that point that he's not Quintana? Officer, we testify that in his experience, many people give him fake names. So they run the name Quintana anyway, and they get a hit for that. And I guess my question becomes, is there any problem with, at that point, really running the name of somebody that is different from the person you thought you were stopping? Well, I'd say looking at United States v. Christian, in that case, the suspect that they stopped to question, they asked him for his name and identity, he gave them a fake name. The police officer then ran that name and date of birth to determine if it was a real person, and it came back that they couldn't find that person. The suspect then stated, well, that's my name and date of birth in Florida. They then had him wait there while they ran the name and date of birth and database in Florida and still determined. And there was no question that that did not fall within the parameters of reasonable suspicion. So I don't think that that would be an issue, that the officers are entitled. So they can run the name to confirm whether such a person exists. At that point, they come up with information that he had his own problem, which I've forgotten. Driving on suspended license. So that gave them a reason. At that point, they could shift their suspicion from the possibility that this person was Yupez to the fact that he is indeed Quintana, but Quintana has his own suspended license problem and they'd seen him driving. That's correct, Your Honor. They had reasonable suspicion, which then moved to probable cause once they determined that. So then they arrested him, and then we get to the search of the car incident to the arrest. That's correct, Your Honor. I guess I have to ask you the same question. I mean, is this a case that we need to defer where Arizona began? The government's position is that the case law is clear in this circuit, that officers can search a vehicle incident to an arrest. So I don't believe that the court have to wait for the determination in the Gantt case. I believe that under Osofie and then the Thornton decision and the Belton decision, that the stop here was because the stop was based on probable cause, that the officers were entitled to search the vehicle of recent occupants. I see that I still have approximately two minutes left. Continuing on the same question Judge Wardlaw asked, as a practical matter, is this case sufficiently similar to Arizona v. Gantt? I'm thinking my way through here. Let's assume for the moment that the Supreme Court comes out with a decision in Gantt that changes case law with regard to search incident to arrest. Now, the facts of this case are a little bit different, but they don't seem so different that this court wouldn't have to take into account whatever the Supreme Court decides in Gantt. And as long as the defendant can keep the case alive on direct appeal, which he'll be motivated to do by filing petitions for re-hearings and petitions for writ of certiorari and so forth, if we get into a situation where the Supreme Court gives us a decision that we have to take into account, is there any point in going down that road expecting having to redouble back as opposed to deferring submission or just leaving this case on the shelf until we find out what the Supreme Court's going to tell us? Your Honor, I'd leave that to the Court's discretion. My understanding is that there was a factual distinction between the underlying facts in this case and that of Gantt. Is there any further questions for me? Are you talking about the passenger? Yes, Your Honor. But we don't know that much about the passenger. I mean, I think your opposing counsel is correct.  but we don't know to what extent the passenger, if the court narrows the grounds for which a search of the car incident to the arrest of the two having to do with safety or danger. We don't know really what was going on with this passenger. So then we might have to send it back for an evidentiary hearing. As far as the record's concerned here regarding the passenger, the officers indicated it was a female passenger that she appeared to be standing by watching to determine what was going to happen with Mr. Quintana, and that was the only information placed on the record, Your Honor. All right. Thank you, counsel. The case of U.S. v. Quintana will be submitted, and we'll take up Sturmans v. Selicki.
judges: Wardlaw, Clifton, Smith